Filed 9/1/21  P. v. Johnson CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAMES E. JOHNSON et al.,<br><br>    Defendants and Appellants. | B301568<br><br>(Los Angeles County<br>Super. Ct. No. MA070386) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Charles Chung, Judge.  Affirmed in part and remanded in part.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant James E. Johnson.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant Michael Alexander Mancha.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

In 2012, James Johnson and Michael Mancha sexually assaulted Stephine G.  The men wanted Stephine, a prostitute working for someone else, to work for them.  Prosecution of the assault was dropped after Stephine stopped cooperating after her initial encounter with police.  In 2015, Johnson criminally threatened Ericka H. and snatched her two-year-old daughter Kaylee away from her to persuade or force her into working for him as a prostitute.  After Ericka reported the crimes to law enforcement, the police reconnected with Stephine and told her of the threats made to Ericka.  Stephine agreed to cooperate.  In 2019, the two sets of charges were tried together.

Johnson was charged in counts 1, 2, 5, and 6 with criminal threats against Ericka (Pen Code, § 422, subd. (a))[1]; kidnapping Ericka's daughter Kaylee, a child under 14 (§§ 207, subd. (a), 208, subd. (b)); pandering by encouragement (§ 266i, subd. (a)(2)); and possession of a firearm by a felon (§ 29800, subd. (a)(1)).[2]  The jury convicted him of all counts and found true the allegations that he personally used a firearm in the commission of the criminal threats and kidnapping.

Johnson and Mancha were charged together in counts 7, 9, 10, and 11 with kidnapping Stephine (§ 207, subd. (a); forcible rape and rape by foreign object in concert (§ 264.1, subd (a)); sodomy by acting with force in concert (§ 286, subd. (d)(1)); and oral copulation by acting with force in concert (§288a, subd.

_____

[1]     Undesignated statutory references are to the Penal Code.

[2]     Count 4 against Johnson only for assault with a semi-automatic firearm was dismissed during trial.  There was no count 3.

2

(d)(1)).[3] The jury was unable to reach a verdict on the kidnapping charge as to either defendant. The jury found both men guilty of rape in concert and sodomy in concert. The jury convicted Johnson of the lesser included offense of forcible oral copulation and entirely acquitted Mancha of oral copulation.

The jury found true allegations that (1) Johnson personally used a firearm in the commission of the offenses involving Stephine (§ 12022.53, subd. (b)); (2) the sexual offenses were committed during the course of a kidnapping (§ 667.61, subd. (e)(1)); (3) the movement of the victim Stephine substantially increased the risk of harm to the victim (§ 667.61, subd. (d)(2)); and (4) Johnson used a deadly or dangerous weapon during the commission of the sexual offenses (§ 667.61, subd. (e)(3).) The jury did not find true the section 667.61 kidnapping, weapon, and firearm allegations as to Mancha.

The trial court sentenced Johnson to 126 years to life in prison, consisting of three consecutive 25-year-to-life terms for the three sexual offenses against Stephine; three ten-year enhancement terms for the use of a firearm in those offenses; an eleven-year term for the kidnapping of Ericka's daughter Kaylee; a 10-year term for the firearm enhancement for kidnapping. The trial court also imposed various fines and fees.

The trial court sentenced Mancha to 18 years in prison, consisting of the upper term of nine years for forcible rape in concert and a fully consecutive term of nine years for forcible sodomy in concert. These terms were consecutive pursuant to section 667.21, subdivision (d), which provides for fully consecutive terms if the sexual offenses are committed against

---

[3]     There was no count 8.

3

the same victim on separate occasions.  The trial court also imposed various fines and fees.

Johnson appeals, contending 1) the evidence of asportation is insufficient to support his conviction for kidnapping Ericka's daughter Kaylee; 2) the trial court erred in allowing his mother Marion to testify that Ericka said she was "tricking" for Johnson; 3) the trial court abused its discretion in excluding Marion's testimony that Ericka "admitted to being coerced into making false statements;" 4) the trial court impermissibly lowered the People's burden of proof when it instructed the jury it could find the charges against Ericka true by a preponderance of the evidence and then use them as evidence of Johnson's intent and absence of mistake as to the offenses involving Stephine; 5) the jury's true finding on the section 667.61 kidnapping allegations related to Stephine must be reversed because they are inconsistent with the jury's failure to reach a verdict on the substantive charge of kidnapping Stephine; 6) the prosecutor committed prejudicial misconduct by commenting on the defense's failure to call as a witness a third man who was present when Stephine was allegedly kidnapped; and 7) the trial court abused its discretion in imposing consecutive sentences for the rape and sodomy convictions.

Mancha joins in Johnson's claim about the jury instruction on the use of the charges involving Ericka as evidence on the charges involving Stephine.  He separately contends the same instruction, CALCRIM 375, did not adequately tell the jury that evidence of the charged offenses involving Ericka could not be used against Mancha to show intent or absence of mistake for the offenses involving Stephine.  Mancha also contends 1) the trial court erred in refusing to impose sanctions against the People for

4

the state's failure to collect (and thereby preserve) exculpatory evidence related to Stephine; 2) the trial court erred in giving a flight instruction in the absence of evidence of flight; 3) the prosecutor committed prejudicial misconduct in commenting on the defense's failure to call the third man who witnessed appellants' initial interactions with Stephine; and 4) the court violated his right to due process and equal protection by imposing certain fines and fees without holding an ability-to-pay hearing. Johnson joins in Mancha's arguments about the People's failure to collect evidence, the flight instruction, and the imposition of certain fines and fees without an ability-to-pay hearing.

We affirm the judgment of conviction as to Mancha. We agree there is insufficient evidence of asportation to support Johnson's conviction for kidnapping Kaylee and we reduce the offense to felony false imprisonment by menace. We find the trial court's stated reasons for imposing consecutive sentences on Johnson for the rape and sodomy charges to be unclear at best and potentially unsupported by evidence. We remand this matter as to Johnson to permit resentencing on the false imprisonment charge and clarification of the court's reasons for imposing consecutive sentences and, if appropriate, resentencing. We affirm the judgment of conviction in all other respects.

## BACKGROUND

I. ***The Charges Involving Stephine***

In 2011, when Stephine was 19 years old, she began working as a prostitute for Robert Walker. She described Walker as physically abusive with strict rules, including demanding that she call him rather than 911 if she encountered trouble. Any violation of his rules would result in physical punishment.

5

Stephine gave Walker all the money she earned from prostitution.

On March 28, 2012, Walker dropped off Stephine and two other prostitutes to work on Sepulveda Boulevard in Van Nuys. Stephine noticed two men in a red SUV drive by repeatedly; they yelled they were going to snatch her. Stephine called Walker, then began walking up a side street to meet him. The red SUV drove up and blocked her. Johnson got out with a gun, hit her on the back of the head, and forced her into the SUV. Someone took Stephine's cell phone and threw it into the bushes. Mancha drove off. Stephine was in the back seat with Johnson. A third man (the "missing" witness) was in the front passenger seat.

The men drove to Lancaster. During the drive, Stephine heard the men discussing the idea of her prostituting for them. In Lancaster, Mancha and Johnson dropped off the third man. They then drove to the house of Deandra Moore, the mother of Mancha's child, on Sancroft. Mancha went inside.

Johnson remained in the vehicle, pointed a gun at Stephine, and demanded that she orally copulate him. She did so briefly. Johnson hit her. Mancha came back to the SUV and said he needed it to take Moore to work. Johnson and Stephine walked around until Mancha left, returned, and picked them up in the SUV. Johnson had his gun with him on the walk.

When they entered Moore's house, no one appeared to be home. Stephine gave slightly varying accounts of what happened at the house. She testified the two men consumed drugs and alcohol and then told her that it was time she was "broken in." Stephine asked Johnson if he was going to use a condom. He hit her. Stephine bent over the couch and Johnson tried to insert his penis into her anus. Mancha was holding her hands. Stephine

6

screamed in pain. Johnson hit her. Mancha told her to be quiet because there were children in the house. Johnson then told her to get on top of him. She asked him to put on a condom, but he hit her instead. She complied with his demands. His penis was in her vagina. Stephine did not want to have sex with Johnson but did so because he was in control with a gun.

Initially Stephine told police Mancha also tried to engage in anal sodomy with her. Stephine also told police that Mancha simply switched with Johnson and had sex with Stephine in the same location. At trial, however, Stephine testified that after Johnson finished, Mancha directed her to go to a back room. There, Mancha inserted his penis into Stephine's vagina against her will. He eventually ejaculated. At trial Stephine did not repeat her claim that Mancha attempted to sodomize her.

Stephine returned to the living room and got dressed. Johnson stayed in the living room with Stephine. Mancha slept in the back room with his children. Johnson fell asleep.[4] Stephine went into the bathroom and called 911. She then called Walker twice, told him she had been abducted and raped, and gave him the address of the house.

When Mancha and Johnson woke up, they handed Stephine a cell phone and told her she was going to work for them on Sierra Highway. She surreptitiously called Walker to tell him where she would be. In the early afternoon they left the house, drove to a liquor store where Mancha purchased condoms for Stephine, and then drove to Sierra Highway where they dropped

---

[4] Stephine initially told police Mancha slept in the living room. She testified at trial that she never saw Mancha's children awake, but previously told police she did see one of the children and waved to her.

7

her off and told her to walk up and down the street and text them when she got a date. They threatened to shoot her if she did not comply.

Stephine walked to the nearby Bonaire Motel. She asked the motel clerk for a business card so she would be able to tell Walker or the police where she was. She did not tell the clerk about her situation or ask him to call 911. She went outside to the parking lot, hid behind a car, and called 911. She told the dispatcher she had been kidnapped at gunpoint in Compton and brought to the area and her kidnappers were driving around looking for her. She then called Walker, who told her he was nearby.

Mancha called Stephine on the cell phone he had given her and asked where she was. She said she was on a date. She later told police Mancha found her, snatched her up, and took her back to the house for two hours. She escaped and went to a Carl's Jr.

In 2015, after Stephine agreed to cooperate with law enforcement, Stephine admitted that in order to protect Walker, she lied to police about what happened after the first 911 call. She did not admit the full extent of her falsehoods until after the preliminary hearing.[5]

At trial, Stephine testified that Walker arrived at the Bonaire motel with two friends in response to her call and picked her up. They tried to follow Mancha's SUV but eventually gave up. Walker dropped Stephine at a Carl's Jr. restaurant and told her to call police.

---

[5] During trial, Stephine received immunity for the lies she told under oath at the preliminary hearing.

Stephine did call 911. However, she also said she had previously called 911 but had been snatched up by her kidnappers while she was waiting for police to arrive. This was not true. At some point thereafter she told police that after she escaped she called a friend, Shea, who picked her up and took her to the Carl's Jr. At trial she admitted that this, too, was a lie.[6]

In response to the first 911 call by Stephine, sheriff's deputies stopped Mancha's red Xterra on Sierra Highway about one-half mile from the Bonaire Motel, at about 2:30 or 3:00 p.m. Police found a gun on Johnson, who was in the passenger seat. As they were booking Johnson for gun possession, the deputies learned the kidnap victim had called again and was at the Carl's Jr. about a mile from the motel. Deputy Diego Andrade and his partner went to the location and met Stephine.

Stephine was crying and she appeared to Deputy Andrade to be in fear. Stephine gave the deputy a cell phone she said her kidnappers had given to her. Stephine told Deputy Andrade that she had been kidnapped and raped. Deputies took her to a hospital for a sexual assault exam. DNA from Mancha was found on her breasts and shoulders; DNA from Johnson was found in her vagina, cervix, rectum, and on her shoulder.

Los Angeles County Sheriff's Detective Sarah Gillis was assigned to Stephine's case. She recovered 911 calls from March 28, 2012, including the two in which Stephine spoke to deputies. Gillis discovered deputies had responded to Moore's house in

---

[6]     Stephine also testified that she lied and used Shea's name instead of Walker's when telling police about her original prostitution activities on Sepulveda. She also falsely told police at one point that she called Shea (not Walker) from the landline at Mancha's house.

9

response to a call from a man who reported that a friend had called him and said she had been kidnapped and raped.[7]

Detective Gillis requested surveillance video from the Carl's Jr. and the liquor store, but never picked up the Carl's Jr. video or followed up to see if the liquor store had video. Detective Gillis spoke with the manager of the Bonaire Motel and obtained a list of guest names. The manager was unwilling to give Gillis more guest information without a subpoena. Detective Gillis did not try to subpoena the information and did not try to locate the guests using only their names. At some point the list was lost. Detective Gillis did request and receive records for the cell phones used in the incident, but later realized she had inadvertently requested the records for the wrong date. By then, it was too late to obtain correct records.

At trial, Detective Gillis explained Stephine soon became an uncooperative witness and the district attorney's policy was not to prosecute sex offenses if the victim was uncooperative. Detective Gillis exercised her discretion and concentrated on her 14 other cases rather than Stephine's case. In July 2012, four months after the events, the district attorney formally rejected the case for prosecution.

## II.    *The Charges Involving Ericka*

In 2015 Ericka was working as a prostitute. She advertised her services on Craigslist. In November 2015, Johnson called

---

[7]    The man gave the landline number his friend had called from, and sheriff's deputies were able to trace the number to Moore's house. Deputy Trojanowski had responded to the address at about 9:00 a.m. on March 28, 2012 in response to a "call for service" but received a higher priority call and left.

Ericka for her services. Ericka hung out with Johnson at his house. There was no sexual activity. She began to spend time at his house in Palmdale and take drugs with him. Other women were present at the house. Johnson broached the idea of Ericka working for him as a prostitute. He said if she gave him all her earnings he would take care of her. Ericka refused, but Johnson persisted in asking. One of the women took a photograph of Ericka to use for advertising. Ericka went to a prostitution appointment Johnson arranged for her. She gave him the proceeds. Johnson told her to limit her time to 15 minutes.

On November 6, 2015, Johnson, his girlfriend Dana, his son James, Ericka, and Ericka's daughter Kaylee went together to a grocery store where he met his mother Marion Johnson. The purpose of the encounter was to buy food for Marion to cook for Johnson and his family that night. The entire group drove to Marion's house. After the groceries were carried in, Johnson told Marion he had to drop off Ericka in Lancaster.

Johnson had arranged for another sex transaction for Ericka that night. Ericka left Kaylee with the women in Johnson's house. Ericka took longer than 15 minutes to complete the transaction and did not obtain any extra money. Johnson became angry, hit Ericka, and beat her with an extension cord. Johnson made Ericka drive around with him. He then returned to his house and told Ericka to get Kaylee and bring her to the car. Ericka did not want to do so, but Johnson threatened her.

Johnson drove to the parking lot of the apartment complex managed by his mother Marion. Another argument ensued, which involved Johnson chasing Ericka around the car. She became concerned that Johnson was going to try to grab Kaylee, so she got into the back seat of the car and held Kaylee. Johnson, in the front seat, produced a gun, demanded Kaylee, and then grabbed Kaylee from Ericka. Ericka screamed and Kaylee cried.

Marion, who was awakened by the argument between Johnson and Ericka, appeared at the SUV. This occurred around 4:00 a.m. Johnson was in the front seat holding Kaylee. Ericka was in the back seat. When Marion opened the car door and saw that Ericka was wearing a "slutty" dress, she asked Ericka if she was "tricking" for Johnson. Ericka replied, "Yes."

Marion took Kaylee from appellant and told Ericka to come with her into her apartment. Ericka went with Marion and Johnson followed. Marion testified that once inside the apartment, appellant kept telling Ericka to come outside and get her beating. He said that once Ericka left the apartment, his friends were going to "get her." After about an hour, Marion threw Johnson out of her apartment. He returned and pointed a gun at Ericka. Johnson finally left for good at about 7:00 a.m. and Marion called 911.

Sheriff's Deputy Joshua Paulson responded to the call. Marion told the deputy Johnson was yelling and hitting Ericka and she had to pull Ericka and Kaylee away from him. She also said Johnson came inside the apartment with a gun and threatened to shoot Ericka if she reported him to the police.

Sheriff's Deputy Peter Schuerger later stopped Johnson in his vehicle. The deputy found a loaded 9 mm handgun in the glove compartment.

Sheriff's Detective Mike Davis accessed the contents of Johnson's cell phone. He discovered text messages showing attempts to arrange locations for paid sex, along with photos and videos of women. The cell phone also contained provocative photos of "women's private parts," including photos of Ericka.

## III.   *The Defense*

Deandra Moore, Mancha's fiancée and the mother of his three sons, testified on Mancha's behalf. She testified that when she returned home from her 13-hour work shift on the evening of March 28, 2012, she did not notice anything unusual. The next day, she discovered some of her high-end make-up and costume jewelry was missing. That afternoon, she received a phone call from a man who sounded African-American. The caller identification showed it was a private caller. According to Moore, the man said "we" owed him money. He threatened to harm her family and shoot up her house if "we" did not pay up. As a result Moore and her family moved away from Lancaster to Lake Los Angeles.

Johnson's defense focused on the evidence related to Ericka. Marion's sister Lawanda Hill testified she was with Marion during a phone call between Marion and the prosecutor Elena Yeh. In the portion of the conversation overheard by Hill, Marion said a sentence of 25 years was excessive and she was going to fight for Johnson and tell him not to take the plea deal. Yeh said if Johnson did not take the deal, there would be more charges and a longer sentence.

Johnson's sister Laura Young testified she spoke with Ericka on the phone at one point and asked her if Johnson had her out "whoring." Ericka said no, she was voluntarily working as a prostitute to make extra money for her birthday.

13

Marion was recalled and testified as a witness for the defense. She said she was an ordained minister and ministered to Ericka for two hours after Johnson left the apartment. When Marion made the 911 call she "was telling them pretty much kind of what [Ericka] was telling [her]." Marion also testified Ericka said Johnson did not force her to go into prostitution. She wanted to make extra money for her birthday and she asked Johnson how to do so. She voluntarily went into prostitution.

## DISCUSSION

I. ***Charges Involving Ericka***

    A.    *There is Insufficient Evidence of Asportation to Support Johnson's Conviction for Kidnapping a Child.*

Johnson grabbed Kaylee from Ericka. The People charged this act as a simple kidnapping of a child in violation of section 207. This charge required the People to prove that Johnson asported Kaylee. Asportation requires a "substantial" movement of the victim. Johnson contends the evidence of asportation is insufficient to support the conviction. Johnson acknowledges that generally the jury must consider the totality of the circumstances to determine whether the movement was substantial, but contends that when the distance is "very short," the movement cannot be substantial and no consideration of other contextual factors is required. We do not agree that distance, however short, can be considered alone. We agree, however, with Johnson's alternate contention that the contextual factors in this case are not sufficient to find the "very short" movement in this case substantial.

14

The California Supreme Court has explained that a simple kidnapping charge requires movement that is substantial in character, but the trier of fact may consider more than actual distance. (*People v. Martinez* (1999) 20 Cal.4th 225, 235–236, *overruled on another ground* by *People v. Fontenot* (2019) 8 Cal.5th 57.) In determining whether the movement is substantial in character, "the jury should consider the totality of the circumstances. Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez,* at p. 237.) The Court has also stated: "At the same time, we emphasize that contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Ibid*.)

Johnson points to this reference to "only a very short difference" to support his contention that when the distance is "very short," no further analysis is needed because no asportation has occurred as a matter of law.

We read *Martinez* differently. The Court in *Martinez* clearly abolished distance, whether short or long, as the sole measure of whether movement is substantial. "[O]ur Supreme Court has 'repeatedly stated no minimum distance is required to satisfy the asportation requirement.'" (*People v. Robertson* (2012) 208 Cal.App.4th 965, 986.)

15

Another child kidnapping case, *People v. Singh* (2019) 42 Cal.App.5th 175, demonstrates why distance alone is a poor measure. The record in that case did not contain evidence of the precise distance the kidnapped child was moved, but "video evidence show[ed] defendant removing the child from inside the bus and taking about five steps away before Mother ran and caught up." (*Id*. at p. 187.) A mere five steps, considered, without context, might seem to be a "very short" movement. Considered in context, however, the movement is substantial. As the *Singh* court explained, the movement took the child "from one environment, the inside of the bus where his mother was, to another environment, outside of the bus where no one knew the child." (*Id*. at p. 188.) As the court also explained "a bus is a mode of public transportation that can shut its doors and take off rapidly; had that occurred here, it would have substantially increased the risk of harm to the child and enhanced defendant's opportunity to commit additional crimes." (*Ibid*.) The *Singh* court concluded: "Considering the totality of the circumstances, a jury could readily and reasonably conclude that the distance defendant moved the child was substantial as it increased the risk of physical or psychological harm to the child above that which existed prior to the asportation, and that the movement enhanced defendant's opportunity to flee with the child and commit additional crimes." (*Ibid*.)

Nevertheless, we agree with Johnson that the totality of the circumstances in this case do not support a finding that his movement of Kaylee was substantial. The distance was indeed "very short", from the back seat of the SUV to the front seat. The movement took place inside the SUV and so did not change the child's environment. (Cf. *People v. Shadden* (2001)

16

93 Cal.App.4th 164, 169, ["Where movement changes the victim's environment, it does not have to be great in distance to be substantial"].)  Further, because Kaylee, Johnson and Ericka were inside the close confines of the SUV, the movement within the vehicle did not decrease the likelihood of detection or provide Johnson with an enhanced ability to commit other crimes. Johnson had a gun and was within arm's reach of Kaylee before he grabbed her, so moving Kaylee a few feet closer to Johnson within the closed confines of the SUV did not increase the risk of harm to her over that presented with Kaylee in the back seat and Johnson in the front.  The risk of harm from an escape attempt by the victim was not changed, since Kaylee, a two-year-old, was not likely capable of "escaping" on her own.  Given the very short distance involved, the other contextual factors in this case are not sufficient to find Johnson's movement of Kaylee was substantial.

We note respondent contends moving Kaylee from the back seat to the front seat put her where Johnson "could readily mistreat her so as [to] punish Ericka's defiance."  The record does not clearly show Johnson's reasons for grabbing Kaylee.  It is possible that he intended to move her out of harm's way before he shot Ericka.  It is also possible, as respondent suggests, that Johnson intended to hold Kaylee as a hostage to coerce Ericka into behaving as he wished.  If that was the prosecution's theory of the case, however, a more appropriate charge would have been kidnapping for ransom, extortion or reward in violation of section 209, subdivision (b), an offense that does not require asportation of the victim.

Because we find insufficient evidence of asportation, we reduce the kidnapping conviction to felony false imprisonment by menace, a lesser included offense of simple kidnapping. Johnson concedes there is sufficient evidence to support such a conviction.

B. *Ericka's Statement to Marion About Tricking Explained the Parking Lot Incident and Was Properly Admitted.*

When Marion opened the door of Johnson's car in the parking lot, Marion asked Ericka if she was "tricking" for Johnson. The trial court exercised its discretion and found that Ericka's out-of-court response to Marion was a spontaneous statement within the meaning of Evidence Code section 1240, an exception to the rule barring hearsay statements. Johnson contends this was error. We disagree.

Evidence Code section 1200 provides that out-of-court statements by a witness are not admissible to prove the truth of the matter asserted in the statement, except as otherwise provided by law. Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous

18

statement exception. [Citations.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 65,)

Johnson contends Ericka's statement did not meet two of the three requirements for a spontaneous statement: Ericka was not under "the stress of excitement" and her statement did not "narrate, describe or explain" the event.

There is substantial evidence to support the trial court's finding that Ericka was under the stress of the incident in the parking lot when she spoke to Marion. Marion testified she heard arguing, went outside, walked up to the car, and observed Ericka was "teary." Marion asked the "tricking" question a couple of times and it took Ericka a long time to reply. When Ericka did reply, she "broke down" and gave a sobbing cry. Ericka's demeanor and behavior shows she was still under the stress of nervous excitement when she answered Marion's question.[8]

There is also substantial evidence to support the trial court's implied finding that Ericka's statement described or explained the startling incident. When Marion called 911 after the incident, she stated "he's calling his self a little pimp. They were out in my parking lot screaming and yelling, and I went out

---

[8] Although Marion initially testified that all she heard when she approached the car was the baby crying, Marion later acknowledged testifying at the preliminary hearing that Ericka was screaming when Marion arrived at the car, agreed that her memory of events was better at the preliminary hearing, and also agreed that she was not exaggerating at that hearing. Although this particular testimony was not before the trial court when it made its ruling, the prosecutor could have reinforced the evidence of Ericka's emotional state with this testimony, if necessary.

19

. . . [a]nd he was threatening her and her baby."[9]  This suggests that Johnson's pimping was part of the dispute in the parking lot, and so indicates that Ericka's response to Marion's question about "tricking" for Johnson was closely connected to the startling incident, which had just occurred and was arguably still ongoing.

Johnson's reliance on *People v. Corella* (2004) 122 Cal.App.4th 461 to show error is misplaced.  There the assault victim stated she hid the car keys to prevent her husband from leaving home while intoxicated.  The court found the victim's statements "were a description of the event that culminated in [his] violent act and were closely connected with the occurrence at issue.  The statements were also an unreflective explanation of her perception of the reasons why [he] hit her." (*Id*. at p. 466.)  Only her statements indicating he was on probation and was intoxicated due to much earlier marijuana use did not qualify as descriptions or explanations of the offense.  (*Id*. at pp. 466–467.)  Here, the evidence indicates that a dispute over Ericka's "tricking" for Johnson occurred during the parking lot incident, even if the dispute might have begun earlier in the day.

---

[9]     Initially the prosecutor intended to play the 911 call during Marion's testimony and the trial court agreed the tape could be played "after the break."  Johnson's counsel objected only to Marion's references to Johnson's probationary status and to a warrant for his arrest.  For reasons which are not clear from the record, the tape does not appear to have been played for the jury until Ericka testified.  The trial court, however, was clearly aware of the content of the tape before Marion testified.

20

In any event, assuming for the sake of argument the statement was erroneously admitted, we would find harmless error. Johnson contends the statement was prejudicial because it is reasonably probable that the statement adversely impacted the jury's verdict on the pandering charge.[10] (*People v. Duarte* (2000) 24 Cal.4th 603, 618–619 [applying *Watson, supra,* (1956) at p. 836 to admission of hearsay in violation of state rules of evidence].) He contends the evidence to support the pandering charge was thin without Ericka's statement.

A person commits the offense of pandering when "[b]y promises, threats, violence, or by any device or scheme, [he] causes, induces, persuades or encourages another person to become a prostitute." (§ 266i, subd. (a)(2).) "[T]he proscribed activity of encouraging someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute." (*People v. Zambia* (2011) 51 Cal.4th 965, 981.) The statute is clear that the crime of pandering is complete when the defendant "encourages another person to become a prostitute" by "promises, threats, violence, or by any device or scheme." (§ 266i, subd. (a)(2).) There is no requirement that defendant succeed. (*Zambia,* at pp. 981-982, fn. 8.)

---

[10] Johnson makes this argument for prejudice as an alternate argument. His primary contention is that error should be assessed under *Chapman v. California* (1967) 386 U.S. 18 as a violation of his federal constitutional right to due process. He cites no cases applying such a standard. As noted above, where, as here, the Confrontation Clause is not implicated, the California Supreme Court treats the erroneous admission of hearsay as state law error to be assessed under *People v. Watson* (1956) 46 Cal.2 818 (*Watson*).

Here, Ericka directly testified Johnson repeatedly attempted to persuade her to work for him. She testified Johnson would "try and convince" her to work for him by offering to protect her and get her "whatever [she] needed" in exchange for her earnings. Ericka went on one "call" after meeting Johnson and the proceeds from that call were given to him. Photographs of Ericka and text messages found on Johnson's phone indicated Ericka was engaging in prostitution in coordination with Johnson. Marion told the 911 operator Johnson was "calling his self a little pimp" and "he call himself pimping this young lady." This is extremely strong evidence that Johnson committed pandering. It is not reasonably probable Johnson would have received a more favorable verdict if Ericka's out of court statement that she was tricking for him had been excluded.

C. *Ericka's Statements to Marion About Being Pressured to Lie Were Not Prior Inconsistent Statements and Were Not Offered in Compliance with the Requirements for Such Statements.*

Johnson contends the trial court abused its discretion and violated his right to present a defense when it excluded Marion's proposed testimony that Ericka admitted she was being forced to say things that were not true. He claims Ericka's admission was highly relevant impeachment evidence.

There is no question that a witness's admission of untruthfulness is highly probative of the witness's credibility. (See, e.g., Evid. Code, § 780, subd. (k).) Not all relevant evidence is admissible, however. Ericka's out of court statement was hearsay and was admissible only if it fell within one of the exceptions to the hearsay rule (Evid. Code, § 1200.)

22

Evidence Code section 1235 provides one such exception, permitting evidence of a hearsay statement by a witness "if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

Ericka's statement about being compelled to say untrue things at the preliminary hearing was not inconsistent with Ericka's testimony at trial. Ericka swore to tell the truth at trial, and stated she was telling the truth during her trial testimony. Assuming for the sake of argument that Ericka gave essentially the same testimony at trial as she gave at the preliminary hearing, an admission that she lied at the preliminary hearing would show her trial testimony was false as well. The admission that she lied could be viewed as inconsistent with her claim at trial that she was telling the truth. Johnson, however, has overstated Ericka's remarks: she did not admit she actually lied during the preliminary hearing.

Initially, defense counsel proffered this scenario: Marion told him that on the day of the preliminary hearing "she advised Ericka to tell the truth and Ericka said, words to the effect, they are making me say things that didn't happen." Counsel attempted to obtain more details from Marion, but according to counsel, Marion "did not ask her what she specifically said. Just that she was being forced to be there and forced to say things that weren't true. And Marion said, don't let that happen. You don't have to say things that aren't true." Marion eventually testified outside the presence of the jury that Ericka told her she did not want to be there, and Marion replied: "It's going to be okay, just tell the truth" and Ericka said, "but they are making me say stuff that is not true." Marion told Ericka "they can't make you say anything. Just tell the truth. Just say what it is."

Significantly, Marion testified that this exchange took place *before* Ericka testified. Thus, Marion's statement does not show that Ericka in fact lied at the preliminary hearing. Put differently, Ericka's statement *before* the preliminary hearing that she was being pressured to lie at the hearing was not an admission that she did lie at the hearing.[11] Thus, it was not inconsistent with her testimony at trial that she was telling the truth.

Further, to be admissible, an inconsistent statement must comply with the requirements of Evidence Code section 770: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action." (Evid. Code, § 770.)

Johnson was unable to show such compliance. Ericka was not questioned about this statement when she testified, and it appears the court had already excused her from testifying further when Johnson brought her statement to the attention of the

_____

[11] There is no evidence Marion asked Ericka whether she was planning to accede to the pressure and lie. Further, Marion was not present for and did not hear Ericka's preliminary hearing testimony, and there is nothing in the record to indicate that the two women subsequently discussed Ericka's preliminary hearing testimony. Ericka may have been persuaded by Marion's exhortations to tell the truth or by the oath she took before testifying. Thus, there is nothing in Marion's testimony to support an inference that Ericka in fact lied during the preliminary hearing.

24

court. Although the trial court agreed to a brief delay to permit the defense to serve a subpoena on Ericka, Ericka did not appear again at trial.[12]

We note Ericka's statement is an excellent example of the importance of Evidence Code section 770's requirement that the witness be given the opportunity to explain her statement when testifying or that the opponent of the statement be given the opportunity to recall her and question her about the statement. We will assume for the sake of argument that a statement by a declarant that she was being made to say untrue things in the future could be construed as inconsistent with the declarant's later statement that she was telling the truth. As the trial court recognized and Johnson has acknowledged, Marion was not clear whether Ericka was claiming she was being pressured to make *false* statements or simply to make statements she did not want to make. Marion testified that after Ericka stated that they were making her say things that were not true, Marion said, "they can't make you say anything. Just tell the truth. Just say what it is. They can't make you say anything against James [Johnson]. [Ericka] said they are making her say stuff because she did not want to say." Without further questioning of Ericka, a jury would only be speculating as to what Ericka actually said to Marion, and what she meant by her apparently contradictory statements.

To the extent Johnson contends that evidence of pressure on Ericka to lie was relevant to impeach her credibility even without a showing that the pressure was effective, Johnson would still face admissibility issues. The only evidence of

---

[12] On appeal, Johnson states that "counsel could not locate Ericka."

25

pressure was Ericka's out of court statement. If that statement were offered for the truth of the matter asserted, that is to show that she was pressured, it would be hearsay.  Johnson has not identified an exception which would allow the statement to be admitted for that purpose.

D.     *Error in Giving CALCRIM 375 Was Harmless as to Johnson.*

The trial court instructed the jury with CALCRIM 375, which permitted the jury, in deciding whether Johnson was guilty of the offenses involving Stephine, to consider evidence that Johnson committed the offenses involving Ericka charged in counts 1 through 5 but "only if the People have proved by a preponderance of the evidence that the defendant in fact committed those offenses."  The instruction further told the jury: "If you decide that the defendant committed these offenses you may, but are not required to, consider that evidence for the limited purpose of deciding whether" the "defendant acted with the intent to rape, sodomize, or orally copulate Stephine G." or "that the defendant's alleged actions were not the result of mistake or accident."  The instruction told the jury that the evidence was "not sufficient by itself to prove that the defendant is guilty of the charges and allegations alleged in counts 7-11." The court slightly modified the instruction to state: "Please remember, that before the jury can vote guilty on any charge, including but not limited to those alleged in counts 1-5, the People must still prove (each) (charge/ [and] allegation) beyond a reasonable doubt."

26

Johnson contends this instruction lowered the burden of proof and permitted the jury to convict him of counts 1-5 based on evidence which the jury did not find true beyond a reasonable doubt. Relying on *People v. Cruz* (2016) 2 Cal.App.5th 1178, he contends the error is structural and therefore reversible per se.

Respondent argues Johnson has forfeited this claim by agreeing to the wording of the instruction. We find Johnson's counsel did not object to the instruction, but we may review "any instruction given, refused, or modified even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

It is well established that evidence of uncharged crimes may be used for any of the purposes, such as intent, identified in Evidence Code section 1101, subdivision (b). The jury need only find the prosecutor has proved prior uncharged crimes or misconduct by a preponderance of the evidence for the jury to consider that evidence for those purposes. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1259.)

Our Supreme Court has held that evidence of *charged* crimes may be considered as *propensity* evidence pursuant to Evidence Code section 1108. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160 (*Villatoro*).) The jury in *Villatoro* was not instructed on the standard of proof required for consideration of the charged crimes for purposes of Evidence Code section 1108,

and the Supreme Court expressly declined to decide the required standard of proof for such use. (*Id*. at p. 1169.)

As the court in *People v. Jones* (2018) 28 Cal.App.5th 316 (*Jones*) noted, Justice Corrigan, in her concurring and dissenting opinion in *Villatoro*, "pointed out that the California Supreme Court has never approved the use of an instruction like the one given here, that is, an instruction stating that evidence of a *charged* offense could be used for a *nonpropensity* purpose (such as finding intent or identity) in determining guilt as to other charged offenses. . . . Justice Corrigan also suggested that requiring the use of two different standards of proof for evidence of a charged offense would likely confuse jurors." (*Id*. at pp. 330-331, second italics added.)

We agree with Justice Corrigan and the court in *Jones* that an instruction which requires " 'the jury to apply two standards of proof to evidence of the *same crime*' " has at least the potential to be confusing. (*Jones, supra*, 28 Cal.App.5th at p. 331.) We find *Jones*, which involves the use of evidence pursuant to Evidence Code section 1101, more directly relevant and more persuasive than *Cruz*, which involves the use of Evidence Code section 1108 to prove propensity.

The court in *Jones* found it unnecessary to decide whether the *Chapman* or *Watson* standard applied, because any error in giving the instruction was harmless under the more stringent *Chapman* standard. We find the *Chapman* standard applicable, for two reasons. "In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury misunderstood or misapplied the instruction in a manner that violates the Constitution." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 906 (*Covarrubias*).) Further, we assess an error

28

that lowers the prosecution's burden of proof for an element of a charged offense under *Chapman*. (*Rose v. Clark* (1986) 478 U.S. 570, 580.)[13]

Here, the trial court modified CALCRIM 375 to emphasize that evidence of the counts 1 through 5 offenses (those involving Ericka) proved by a preponderance of the evidence "is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charges and allegations alleged in counts 7–11." The court also told the jury: "Please remember, that before the jury can vote guilty on any charge, including but not limited to those alleged in counts 1-5, the People must still prove (each) (charge/ [and] allegation) beyond a reasonable doubt." This is a slightly stronger version of CALCRIM 375 than was used in *Jones*; the *Jones* version told the jury: " '*The People must still prove every charge beyond a reasonable doubt.*' " (*Jones, supra,* 28 Cal.App.5th at p. 332, italics added.)

Like the trial court in *Jones*, the trial court in this case also instructed the jury on reasonable doubt with CALCRIM No. 220, which provided in part, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically

---

[13]    The instruction permitted the use of conduct proved by a preponderance of the evidence only to show intent or absence of mistake. If we were to find the instruction ambiguous, we would find the likely misreading involved the use of evidence proved by a preponderance of the evidence to prove any required "intent" element of the charged offenses involving Ericka.

29

instruct otherwise." The court also gave CALCRIM No. 224 on sufficiency of circumstantial evidence which provided in part, "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." (See *Jones, supra*, 28 Cal.App.5th at pp. 332–333.) Here, the jury was also reminded in CALCRIM No. 359 on the corpus delecti rule, that "You may not convict the defendant unless the People have proved (his) guilt beyond a reasonable doubt."

The evidence on counts 1, 2 and 5 was very strong. Both Ericka and Johnson's mother Marion testified Johnson had a gun and threatened to kill Ericka. Johnson's claim that Marion was simply repeating what Ericka told her is meritless. During the 911 call, Marion described going out to the parking lot and Johnson "was threatening her and her baby." More specifically, Marion stated: "for my son to walk up in my house with a gun and threatened to kill her with a gun up in my house." Further, when Johnson was arrested, he was in possession of a gun.

Ericka testified Johnson tried to persuade her to work for him as a prostitute. Marion partially corroborated Ericka's testimony when Marion told the 911 operator that the "young lady that he's running—he's calling his self a little pimp. They were out in my parking lot screaming and yelling." She also stated: "But he call himself pimping this young lady. She's in my house now." Both statements strongly suggest Marion heard the statements herself. Marion described Johnson as making the pimp statements about himself, which would be odd phrasing if, as Johnson now argues, Marion was simply repeating what Ericka told her. The pandering charges were further

30

corroborated by the photo of Ericka on Johnson's phone, as well as text messages on that phone consistent with arranging sex for pay.

Ericka testified about Johnson grabbing Kaylee from her. Marion also partially corroborated Ericka's account of the kidnapping (now false imprisonment) when she testified she heard an argument in the parking lot and when she reached the car Ericka was in the back seat and Johnson was in the front seat holding Kaylee.

Given the numerous instructions on reasonable doubt and the strength of the evidence on counts 1, 2 and 5, we see no reasonable possibility that Johnson would have received a more favorable outcome in the absence of CALCRIM 375.

## II. *Charges Involving Stephine*

### A. *There Is No Reasonable Likelihood the Jury Misunderstood CALCRIM 375 as Applying to Mancha.*

As we have just discussed, the trial court permitted evidence of Johnson's conduct involving Ericka to be used pursuant to Evidence Code section 1101 to show Johnson's intent and absence of mistake as to the charges involving Stephine. Mancha contends the trial court erred prejudicially in failing to instruct the jury this evidence could not be used against Mancha to prove Mancha's intent or absence of mistake for the charge involving Stephine. We find the trial court's instructions adequate on this issue.

Before the presentation of evidence about the offenses against Ericka in the second half of the prosecution's case, the trial court instructed the jury: "So unless I say otherwise, the

31

next set of witnesses that are coming in all relate to counts 1 through 5. 1 through 6, I should say. What you need to understand is that the counts 1 through 6 apply to defendant Johnson only. So the evidence you are about to hear from this point on, again, unless I mention otherwise, you can use only in regard to defendant Johnson as it related to his case. [¶] And actually I need to correct myself. It applies to counts 1 through 5. You can use it for the entirety of the case against Mr. Johnson but Mr. Johnson only."

During closing instructions, the trial court instructed the jury pursuant to CALCRIM 303 that "[d]uring the trial certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." The trial court also used CALCRIM 304 to remind the jury "I instructed you during the trial that certain evidence was admitted only against a certain defendant. You must not consider that evidence against any other defendant."

Mancha contends these instructions are insufficient because the court's mid-trial instruction only limited the use of the Erica evidence to Johnson's guilt on the count 1 through 5 charges, and did not limit the use of the evidence on counts 9 and 10, the counts in which Mancha was also charged. CALCRIM 303 and 304 simply referred back to that mid-trial instruction. Mancha contends that CALCRIM 375 was not sufficient to overcome this omission.

The jury did not learn it could use the Ericka evidence for counts 9 through 11 until the court gave the final jury instructions after the presentation of evidence was complete. Before that time, the jury knew only that the evidence was being introduced to prove Johnson's guilt of counts 1 through 5, and

32

their use of that evidence was limited to that purpose. Thus, CALCRIM 375 both introduced the jury to the Evidence Code section 1101 use of the evidence and limited that use. We will treat Mancha's argument as a claim that the instruction is ambiguous. We see no reasonable likelihood the jury understood or applied the instruction in the manner suggested by Mancha. (See *Covarrubias*, *supra*, 1 Cal.5th at p. 906.)

" 'A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.' " (*Covarrubias*, *supra*, 1 Cal.5th at p. 906.) We may also "consider the arguments of counsel in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

As given, CALCRIM 375 begins "The People presented evidence that *defendant Johnson* committed the offenses charged in counts 1 through 5. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed those offenses. . . . [¶] . . . [¶] If you decide that the defendant committed these offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant acted with the intent to rape, sodomize or orally copulate Stephine G., or the defendant's actions were not the result of mistake or accident." (Italics added.)

After the initial use of the term "defendant Johnson," the instruction uses the term "the defendant." The first two uses of "the defendant" can only refer to one specific defendant, Johnson, because that term refers to the person who committed the offenses: "the defendant in fact committed those offenses" and

33

"the defendant committed these offenses." It is not reasonably likely that a juror would decide that the term then changed its meaning in the middle of the instruction and thereafter could refer to either defendant. It would be very unlikely given that the third and fourth (and most critical) uses of the term would be heard as part of one sentence which began by using term "the defendant" in its specific sense of defendant Johnson: "If you decide that *the defendant committed these offenses*, you may . . . consider that for the limited purpose of deciding whether: [¶] [*t*]*he defendant* acted with the intent to rape . . . or *the defendant's* actions were not the result of mistake or accident." (Italics added.)

Our conclusion is reinforced by the prosecutor's closing argument, which is consistent with this common-sense reading of the instruction. She told the jury: "[Y]ou can use the two incidents that we have alleged, the 2012 and the 2015 incident, in terms of when you look at defendant Johnson. You see that in 2015 he was trying to get Ericka to prostitute for him and he was being very forceful about it. You can use that incident to show his intent to do the same thing for Stephine."

Mancha's attorney reminded the jury that "in the second half of the charges none of those charges had anything to do at all with Mr. Mancha at all. Period. I didn't object. I didn't ask any questions. I didn't do anything. Why? Because Mr. Mancha was not involved, and you cannot let one bleed over into the other."

We do not agree with Mancha's contention that the aiding and abetting instructions which immediately follow CALCRIM 375 "allowed the jury to assume [Mancha] vicariously shared Mr. Johnson's intent and factual assumptions." We see nothing which permits such an assumption. CALCRIM 401

34

requires the People to *prove* the aiding and abetting defendant knew of the perpetrator defendant's intent and "before or during the commission of the crime" intend to aid and abet the perpetrator in committing the crime. Put differently, the instruction required proof that Mancha knew in 2012 of Johnson's intent to sexually assault Stephine. Further, the aiding and abetting instructions supported the three sexual offense in concert charges against Mancha.[14] The prosecutor's argument on the oral copulation in concert charge made it clear that the jury could not assume Mancha shared Johnson's intent toward Stephine for "in concert" (and therefore aiding and abetting) purposes, and the jury's acquittal of Mancha on that charge shows the jury correctly understood this. The prosecutor told the jury she did not know "whether or not the two of them making [Stephine] strip in the desert, Mancha driving and providing the place with his van, is enough for [the] oral copulation in concert. . . . I think we have a solid case of oral copulation by force when it comes to Johnson. . . . I don't think the facts came out that Mancha knew that that was going to occur when he stepped out of the van. I don't know that, so I'm not going to argue that." The jury subsequently acquitted Mancha on this charge.

Mancha contends in his reply brief that the court's use of CALCRIM 203 directed jurors to understand the singular use of the term "defendant" to apply to both defendants. CALCRIM 203

---

[14] The sexual offense instructions told the jury that a defendant committed the offense in concert if he aided and abetted someone else who personally committed the offense; the instruction referred the jury to the separate instructions on aiding and abetting for guidance on that issue.

told the jury: "Unless I tell you otherwise, all the instructions apply to each defendant." We do not consider arguments raised for the first time in a reply brief. If we were to consider the argument, we would find that a reasonable juror would understand the use of Johnson's name at the beginning of the instruction meant the instruction applied only to him.

B. *Error In Giving A Flight Instruction Was Harmless.*

Mancha contends the trial court erred in giving CALCRIM 372 on flight because there was no evidence to show he acted to avoid arrest or detection. Johnson joins in this contention.

CALCRIM 372 as given told the jury: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing a crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of the conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

Generally giving the flight instruction erroneously is considered harmless because "the instruction [does] not assume that flight was established, leaving that factual determination and its significance to the jury." (*People v. Visciotti* (1992) 2 Cal.4th 1, 61.) Here, the court also told the jury that "[s]ome of these instructions may not apply" and "[d]o not assume just because I give you a particular instruction that I'm suggesting anything about the facts."

Appellants have not suggested why we should depart from this general rule. Although the prosecutor requested the flight instruction, she did not mention the flight instruction during jury argument or dwell on appellants' movements after the crimes. We see no reasonable probability of a more favorable outcome if

the flight instruction had not been given.  (*People v. Crandell* (1988) 46 Cal.3d 833, 870 overruled on another ground by *People v. Crayton* (2002) 28 Cal.4th 346; *People v. Clem* (1980) 104 Cal.App.3d 337, 344–345 [applying *Watson* standard of review to claim flight instruction was given erroneously].)

C.      *There Are No Inconsistent Verdicts.*

Johnson contends the jury's true findings on the kidnapping enhancement allegations are inconsistent with the jury's inability to reach a verdict on the count 7 charge of kidnapping Stephine: the essential elements of the two charges are identical and so the true findings must be vacated.

As Johnson acknowledges, as a general rule, inconsistent verdicts are permitted if the guilty verdict is supported by substantial evidence.  (See. e.g. *People v. Bell* (2020) 48 Cal.App.5th 1, 9–10; *United States v. Powell* (1984) 469 U.S. 57, 64–69.)  "For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.]  Although ' " error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.]  It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.'  [Citation.]  Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury convicted."  (*People v. Avila* (2006) 38 Cal.4th 491, 600.)

Johnson contends there is a "limited judicial exception" to this rule set forth in *People v. Hamilton* (1978) 80 Cal.App.3d 124 (*Hamilton*).[15]  This exception applies "where all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty."  (*Id*. at p. 130.)

Respondent argues that *Hamilton,* and *In re Johnston* (1935) 3 Cal.2d 32 upon which *Hamilton* is largely based, are no longer good law or, if still valid, would only apply to conspiracy cases.  We need not decide the continuing viability of these cases because we see an even more fundamental flaw in Johnson's argument.  The *Hamilton* exception applies to a situation where a defendant received a verdict of acquittal on one count and a verdict of conviction on another count.  Johnson did not receive a verdict of acquittal on the count 7 kidnapping count.  The jury was not able to reach a verdict at all on that count.

Johnson contends our analysis should focus on the six not guilty votes and in effect treat them as the jury's verdict.  He contends:  "The jury's failure to reach a verdict on count 7 is just as inconsistent with the unanimous true findings on the [kidnapping] enhancements attached to counts 9, 10 and 11 as if the jury fully acquitted Johnson.  In either case, several jurors who chose to vote 'true' . . . on the kidnapping enhancement

---

[15]    Overruled on another ground by *People v. Flood* (1998) 18 Cal.4th 470, 481.

38

allegations also voted not guilty on the kidnapping charge. That is inconsistent."

As the United States Supreme Court has explained, a situation involving inconsistent verdicts and one "involving both *verdicts* and seemingly inconsistent *hung counts* . . . are quite dissimilar." (*Yeager v. U.S.* (2009) 557 U.S. 110, 124 [considering issue preclusion argument].) "[H]ung counts have never been accorded respect as a matter of law or history, and are not similar to jury verdicts in any relevant sense." (*Ibid*.) "Because a jury speaks only through its verdict, its failure to reach a verdict cannot—by negative implication—yield a piece of information that helps put together the trial puzzle." (*Id*. at p. 121.) "[T]he fact that a jury hangs is evidence of nothing—other than, of course, that it has failed to decide anything." (*Id*. at p. 125.) "A host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few—could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return." (*Id*. at pp. 121–122, fns. omitted.) Put differently, a hung count cannot rationally be used "to question the basis of the jury's verdicts." (*Id*. at p. 125.)

D. *Appellants Have Forfeited Their Prosecutorial Misconduct Claim.*

There was evidence that a third man was in the car when Johnson first forced Stephine into the car in Van Nuys. He was not present during any of the alleged forcible sex acts. The third

39

man was not called as a witness by either side.  Johnson and Mancha contend the prosecutor committed misconduct during rebuttal closing argument when she stated: "The witnesses they called, they choose to call, were the ones that make my victims seem like they are liars.  But the one witness that they could have called, the one logical witness to show what happened would have been that third guy in the car.  We didn't see him.  That would have been a logical witness and if the defense is claiming---" Defense counsel objected.

Respondent acknowledges appellants objected to the argument but contends the claim is nevertheless forfeited by their failure to request a curative admonition.  We agree.

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.  [Citations.] 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).)

After appellants objected, the court immediately stated at sidebar:  "So my understanding is he's dead; right?"  Johnson's counsel replied:  "His name is Johnny Laney.  We did investigate his whereabouts. . . .  [H]e was shot to death while walking his daughter to school."  Counsel acknowledged he relied on statements from Johnson and his family for the name of the man; counsel verified that a man with this name who matched the description of the third man moved to Las Vegas and was killed in a shooting.

The prosecutor pointed out that there was no actual evidence of the identity of the third man. She referred to a phone (presumably found at the scene) as a source of evidence of the third man's identity which the defense failed to investigate, but Mancha's counsel reminded the court that the parties had stipulated that the passage of time had rendered the records for the phone unavailable.

The trial court asked: "In either case, is it correct that the defense can't call this third person because —my understanding is if it's not Laney and if the person is alive, we don't know who that is; is that correct?" Johnson's counsel replied: "Right." The court then told the prosecutor that it agreed and was "not going to let you argue along these lines because I think it puts you in dangerous territory."

Johnson's counsel stated: "I will ask the court to strike that portion of her argument." Mancha's counsel stated: "I would join." The trial court granted the request and told the jury "I am going to strike that last line of argument."

Both Mancha and Johnson attempt to avoid forfeiture by characterizing this request to have the argument stricken as a request for an admonition. We strongly question whether a bare statement to the jury that an argument is stricken amounts to an admonition. Although there is no uniform definition of the term, most common definitions of "admonition" refer to the term as advice or counsel that includes a warning. (See e.g. <https://dictionary.cambridge.org/us/dictionary/english/admonition> [as of Aug. 27, 2021], archived at <https://perma.cc/XF29-VFH3> ["a piece of advice that is also a warning"]; <https://www.merriam-webster.com/dictionary/admonition> [as of Aug. 27, 2021], archived at <https://perma.cc/H56J-T8SD>

["counsel or warning"].)  Even if we were to treat appellants' request as an admonition, however, it would not assist them.

Appellants' primary contention on appeal is that the "admonition" was ineffective to cure the prejudice from the argument.  Johnson argues that simply striking the argument would not have "accomplished all that much."  Macha claims it would be "unrealistic to expect that the court's anemic admonition purged from the jurors['] minds the inference of hidden, inculpatory evidence."  An "admonition" striking the testimony was all appellants requested, and it was given as requested.  It would defeat the purpose of requiring that a defendant request an admonition if he could request an ineffective one and then complain about it on appeal.  In addition, the doctrine of invited error would bar appellants from raising a claim of error after employing such tactics.

Macha impliedly contends that a request for an admonition would have been futile.  A defendant will be excused from requesting an admonition if the objection or request would be futile, either because an admonition could not cure the harm or the trial court would not have granted the request.  (*Seumanu*, *supra*, 61 Cal.4th at p. 1328.)  Mancha suggests both situations are present here.  We do not agree.

Mancha contends the prosecutor's argument was "a bell that could not be unrung," which implies any admonition would have been ineffective.[16]  Johnson, however, has shown exactly

---

[16]    Mancha takes this argument a step further contending that the "error arose from the court's refusal to order a mistrial based on the appellants' inability to eliminate the prejudice caused by the prosecutor's inaccurate comment."  We do not consider claims

42

how any potential prejudice from the argument could have been mitigated. As he points out, the trial court could have "explain[ed] to the jurors that the inference the prosecutor sought to create—i.e. that the defense made a tactical choice not to call the third man and that that choice was reflective of what the third man might say had he been called as a witness—was unfounded." Thus, an admonition would not have been ineffective.

Mancha also claims the trial court was sympathetic to the prosecutor, claiming the court gave the prosecutor a "near apology" for sustaining the objection and only gave a "half-hearted" and "anemic" admonition to the jury. This too appears to be an implied futility claim, more specifically that a request for a more detailed or forcible admonition would have been futile because the trial court would not have granted such a request.

We do not understand the trial court's statement as anything close to an apology. The court stated that it wished "to protect everyone, including the D.A., including the integrity of this case, [and so] I'm not going to let you argue along these lines because I think it puts you in dangerous territory." We understand this as a warning to the prosecutor that her line of argument could have serious consequences. As for the court's statement striking the argument, the trial court gave appellants exactly what they asked for. We see nothing to suggest the trial court would have refused some form of the admonition described by Johnson's counsel. Futility does not excuse appellants from forfeiture.

---

raised for the first time in a reply brief, but we note appellants did not move for a mistrial.

E.  *The Unrecovered and Lost Evidence Had No
Exculpatory Value.*

During her investigation of the offenses against Stephine,
Detective Gillis failed to collect or preserve video from Carl's Jr.
and the liquor store and telephone records from the cell phones of
Stephine and Mancha.  She also failed to preserve the guest list
from the Bonaire Motel.  Mancha asserted in pretrial motions
and his motion for a new trial that these failures violated his due
process rights to a fair trial and his presentation of a complete
defense under *California v. Trombetta* (1984) 467 U.S. 479
(*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51
(*Youngblood*); he sought discovery sanctions in the form of
dismissal or in the alternative an instruction advising the jury it
could infer that the discovery violations adversely impacted the
defense case.  Mancha contends the trial court erred in denying
his motions.  As he did in the trial court, Johnson joins in this
claim.  Assuming due process concerns apply to the state's failure
to collect evidence, we see no error in the trial court's ruling that
the evidence was not apparently or potentially exculpatory and
that Detective Gillis did not act in bad faith.

1.  Applicable law

The federal due process clause requires the state to
preserve "evidence that might be expected to play a significant
role in the suspect's defense." (*Trombetta*, *supra*, 467 U.S. at
p. 488.)  The evidence "must both possess an exculpatory value
that was apparent before the evidence was destroyed, and be of
such a nature that the defendant would be unable to obtain
comparable evidence by other reasonably available means." (*Id.*
at p. 489.)  This same broad rule does not apply to evidence "of
which no more can be said than that it could have been subjected

to tests, the results of which *might* have exonerated the defendant." (*Youngblood, supra,* 488 U.S. at p. 57, italics added.) A state's failure to preserve such "potentially useful" evidence violates due process only where the defendant shows bad faith on the part of the prosecutor or police. (*Id.* at pp. 57–58.) The presence or absence of bad faith on the part of the state is closely related to law enforcement's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Id.* at pp. 56–57, fn. *.)

As appellants acknowledge, the holdings of *Trombetta* and *Youngblood* apply to cases in which the state fails to preserve evidence. The California Supreme Court has recognized that "[i]t is not entirely clear that the failure to obtain evidence falls within ' "what might loosely be called the area of constitutionally guaranteed access to evidence." ' (*Youngblood, supra,* 488 U.S. at p. 55 [109 S.Ct. at p. 336]; see *id.* at pp. 56–57 [109 S.Ct. at pp. 336–337] [emphasizing high court's unwillingness to read due process clause as imposing on police absolute duty to retain and preserve all material that might be of conceivable evidentiary value].) Although this court has suggested that there might be cases in which the failure to collect or obtain evidence would justify sanctions against the prosecution at trial, we have continued to recognize that, as a general matter, due process does not require the police to collect particular items of evidence." *(People v. Frye* (1998) 18 Cal.4th 894, 943, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "The police cannot be expected to 'gather up everything which might eventually prove useful to the defense.' " (*People v. Hogan* (1982) 31 Cal.3d 815, 851 disapproved on another ground by *People v. Cooper* (1991) 53 Cal.3d 771, 836.) "Even if the

failure to collect evidence comes within the scope of *Trombetta* and *Youngblood*," a defendant would be required to make the requisite showing of materiality under *Trombetta* or bad faith under *Youngblood* to show a due process violation. (*Frye,* at p. 943.)

A trial court's finding on whether the state violated due process by failing to preserve evidence is a factual one. We review that decision to determine whether it is supported by substantial evidence. (*People v. Carter* (2005) 36 Cal.4th 1215, 1246.) The same standard of review applies to a trial court's finding on whether the state acted in bad faith in failing to preserve evidence. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 776.) As a matter of logic, the same standard would apply to decisions concerning the state's failure to collect evidence.

###### 2. Appellants' motions for discovery sanctions

Appellants brought three motions seeking discovery sanctions for the state's failure to obtain and preserve evidence. On March 11, 2019, Mancha filed a motion based on Detective Gillis's failure to pick up surveillance video from Carl's Jr. and to follow up her unanswered request for surveillance video at the nearby liquor store. The trial court denied the motion, finding both that the evidence had no exculpatory value and Gillis did not act in bad faith. On March 18, 2019, Johnson filed a motion based on the unrecovered videos and on the unrecovered or unpreserved cell tower records. The trial court denied this motion on "for the same reasons" as it had denied the previous motion. On March 25, 2109, Mancha filed a motion based on the state's loss or destruction of the Bonaire Motel guest list and Detective Gillis's failure to retrieve phone records showing calls in and out of the cell phones and Mancha's landline. The trial

court denied this motion on the same grounds as it had the previous motions.

Because the sanctions motions involve overlapping evidence, we analyze the motions below by evidence category. We do not consider any claims raised for the first time on appeal, such as appellants' claim that the videos might have shown Stephine in possession of a makeup purse or bag which Mancha's fiancée discovered missing the day after the sexual assaults took place. We also do not consider separately appellants' complaints about unrecovered and lost evidence raised in their October 2010 motion for new trial. They made the same arguments about the same evidence as they had in their previous sanctions motions. Since we find no error in the trial court's ruling on those motions, we find no err in the trial court's denial of the new trial motion made on the same grounds. Further, as the trial court pointed out: "As far as the phone records and the wrong information, to that, that was a legitimate mistake by the detective. And the defense fully capitalized on that and did a good job. In fact, we spent a decent amount of time and it was pointed out a number of times that that error was made and that was used very well by the defense."

### a. Carl's Jr. and liquor store videos

In his March 11, 2019 motion, Mancha argued that the Carl's Jr. video "would likely have shown the complaining witness being dropped off by her 'pimp,' that she was not in danger and that she was not afraid." The liquor store video "would have also likely captured similar results." Mancha

47

contended the exculpatory value of the evidence was apparent and so no bad faith showing was required.[17]

At the hearing on the motion, the trial court stated that nothing had been presented to lead the court to believe the videos were exculpatory. Defense counsel summarized the defense position: "[I]t would be exculpatory because initially you have one story about how this lady ended up at Carl's Jr. and then you have a different story. And the video would supposedly show which one of those was accurate. And based on which one of those stories was accurate, it could be obviously exculpatory to Mr. Mancha and it could help the case." As defense counsel had earlier acknowledged, Stephine gave one account to police at the time of the incident and then changed her story "years later." The trial court was not persuaded it was exculpatory. There was and is nothing to suggest the sexual assaults took place in or near the Carl's Jr. and liquor store area, or that the perpetrators accompanied the victim to that location. Thus, the video had no apparent exculpatory value.

There is substantial evidence to support the finding the videos were not potentially exculpatory at the time Gillis

---

[17] Johnson raised the issue of the videos in his March 18, 2019 motion seeking a jury instruction as sanctions, but did not make any argument about the exculpatory value of those videos. At the hearing on his motion, he repeated Mancha's earlier argument that Stephine originally claimed to have run alone to the Carl's Jr. but then stated later that she was picked up and dropped off at the Carl's Jr. by Walker, and the video would show what really happened. The trial court, who had asked if Johnson had "anything new that . . . would lead anyone to believe that the evidence was exculpatory in nature," denied the motion for "all the reasons stated before."

neglected to recover them. The evidence showed Stephine changed her story years after the case was closed. Gillis could not have been aware in 2012 that Stephine would change her story years later when the case was reopened. She knew only that Stephine claimed to have arrived in the area on her own.[18] Thus, in 2012 the most that could be said of the video was that it might in some unknown way have contradicted Stephine's account of her arrival at the Carl's Jr. The possibility of contradiction is pure speculation, however, and speculation is not sufficient to make the tape potentially exculpatory. (See *People v. Alexander* (2010) 49 Cal.4th 846, 878 (*Alexander*) [rejecting contention that state had duty to preserve tape because defendant's "claim that the erased audio tape had exculpatory value is based on speculation that something on it would have contradicted the evidence and testimony tending to show that [the subject] was not hypnotized"]; *People v. Cook* (2007) 40 Cal.4th 1334, 1349 (*Cook*) [rejecting as speculative defendant's bare claim that trash bag police found in his garage containing bloody shoes and items of ordinary household trash was

---

[18] Mancha contends Gillis requested the video because it would have shown if Shea or Walker dropped off Stephine at the Carl's Jr. He does not provide a record cite to support this claim, which seems unlikely. It is not our responsibility to search the record. Gillis testified on direct examination that she considered the video as "just corroborating evidence whether she was at the location or not." We note Gillis would have had no need to obtain the video to document Stephine's physical condition when she arrived at the Carl's Jr. Police took photographs of Stephine's face, which showed only some minor injuries. Stephine also underwent a sexual assault exam.

potentially exculpatory because he "might" have discovered items in the trash bag linking "other persons" to the shoes].)

We also find substantial evidence to support the trial court's ruling that Gillis did not act in bad faith in failing to follow up and obtain copies of the video. Gillis testified that shortly after April 4, 2012, Stephine stopped responding to Gillis's voicemail messages and Gillis could not contact her. Gillis then considered Stephine an uncooperative victim. Gillis was aware that the district attorney had a policy of not prosecuting sexual assault cases where the victim is uncooperative. Gillis explained that she had 14 other cases that month and she used her discretion to put more time into those other cases. The trial court found Gillis credible. This chain of events does not show bad faith by Gillis, particularly since the videos had no exculpatory potential under the facts of the case as known at that time.

### b. Bonaire Motel guest list

Stephine stated she asked "workers" in the parking lot of the motel if she could use their phone to call police. At some point she hid behind some cars. There is no evidence in the record to suggest that anything else occurred in parking lot. Gillis spoke with the manager, who remembered seeing Stephine. Gillis obtained a list of names for motel guests. At some point before the trial of this matter, the list was lost or destroyed.

In his March 25, 2019, motion, Mancha contended the Bonaire Motel guest list was exculpatory because individuals on that list "could have been witnesses and provided crucial information." He provided no details about what that information would have been. The trial found the list had no exculpatory value. Given that appellants were unable to offer

50

even speculation about what that crucial information might be, the trial court correctly found there was nothing about the list that had exculpatory value. (See *Alexander*, *supra*, 49 Cal.4th at p. 878 ; *Cook*, *supra*, 40 Cal.4th at p. 1349.)

### c. Phone records

In his March 25, 2019, motion, Mancha contended the cell phone records would have shown that Stephine "was using Mr. Mancha's phone, when and to whom her calls were made, the location from which those calls were made geographically, from whom and when were calls received and how many times and from whom were calls made to support multiple defense theories[,] including but not limited to that the caller on a blocked number constantly was asking for money and making threats." He then contended the exculpatory value of the evidence was apparent and so no bad faith showing was required.)[19]

---

[19] In his March 18, 2019 motion, Johnson similarly complained of law enforcement's failure to obtain or preserve the "cell tower records" for the phone Mancha gave to Stephine, Johnson's phone, and Stephine's phone. Johnson did not, however, offer any arguments in his written motion about the exculpatory nature of the records. The cell tower records were not discussed at the hearing on the motion. The court stated that everything it was being told was speculative. The court overstated the strength of Mancha's argument, which did not even take a stab at what the records might show.

At the hearing on the motion, defense counsel emphasized that call logs "would have shown potentially that a blocked number was calling the phone and, also, that the calls coming into the land line could have been from a blocked number and could have corroborated what Mr. Mancha's fianceé testified to." Counsel clarified the cell phones were the ones where Detective Gillis requested extractions but put in the wrong date. The error was not discovered until 2019, and by that time the records were no longer available.

The court denied the motion, finding there was nothing apparently exculpatory about the call logs. Substantial evidence supports this finding. Stephine testified at trial that Mancha gave her a cell phone before dropping her off to work on Serra Highway. She admitted she used the phones to make calls, and acknowledged receiving a call from appellants asking where she was. It would be pure speculation that the phone might somehow contradict her account. (See *Alexander*, *supra*, 49 Cal.4th at p. 878 ; *Cook, supra*, 40 Cal.4th at p. 1349.)

The only specific example of possible exculpatory evidence was appellants' claim that the phone might have been used to make the blocked call demanding money to Mancha's fiancée. However, there is no evidence that Detective Gillis would have been aware in 2012 of appellants' defense that Mancha's fiancée was receiving such calls (and that the calls showed that Stephine voluntarily had sex with appellants for which the calls were seeking payment).

The trial court also found that the detective's error in asking for the wrong dates "was totally inadvertent. She—I think during cross her embarrassment came out. There was

nothing bad faith on her part." We defer to the trial court's credibility findings.

### 3. Prejudice

Because we have found the evidence at issue was not exculpatory, we need not address appellants' claim of prejudice. We note that their claims of prejudice focus on the centrality of Stephine's credibility to their defense. We agree that undermining Stephine's credibility was an important part of appellants' defense, particularly since DNA evidence showed appellants engaged in sexual activity with Stephine, and one of the 911 calls involving Stephine was linked to the Sancroft house. Even without the unrecovered evidence or an instruction, the jury was well aware that Stephine had been untruthful in the past. She admitted it at trial. But while Stephine had a motive to lie in the past, she no longer had such a motive by the time of trial. Assuming the unrecovered evidence contained additional evidence that Stephine had lied about her movements between leaving the Sancroft house and speaking to sheriff's deputies, such evidence would have had minimal additional probative value as to her honesty at trial. Thus, we see no reasonable probability or possibility that appellants would have received a more favorable verdict if Gillis had recovered and preserved the evidence at issue or if the trial court had instructed the jury that it could infer that the unrecovered or unpreserved evidence would have shown that Stephine's 2012 account of her movements after leaving the Sancroft house were not true.

III.   *Sentencing Issues*

   A.   *Appellants Have Forfeited their Claims That the*
        *Court Erred in Imposing Fines and Fees Without a*
        *Hearing.*

The trial court imposed a court operations fee of $40
(§ 1465.8, subd. (a)(1)) and a criminal conviction fee of $30 (Gov.
Code, § 70373) on each appellant, a $5,400 restitution fine
(§ 1202.4, subd. (b)) and matching parole violation fine
(§ 1202.45) on Mancha and a $10,000 restitution fine and
matching parole violation fine on Johnson.  Mancha contends the
trial court violated his rights to due process and equal protection
under the U.S. and California constitutions by imposing the fines
and fees without determining if he had the ability to pay them.
He argues that under *People v. Dueñas* (2019) 30 Cal.App.5th
1157, we must strike the fines and fees until it is proven he has
the ability to pay them.[20]  Johnson joins in this contention.

Appellants did not object to the imposition of these fines
and fees in the trial court and so have forfeited their claims.
(*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155; see
also *People v. Avila* (2009) 46 Cal.4th 680, 729 [finding forfeiture
where the defendant failed to object to imposition of restitution
fine under former § 1202.4 based on inability to pay].)  We decline

_____

[20]    The California Supreme Court has granted review on the
following two issues: "Must a court consider a defendant's ability
to pay before imposing or executing fines, fees, and assessments?
If so, which party bears the burden of proof regarding defendant's
inability to pay?"  (*People v. Kopp* (2019) 38 Cal.App.5th 47,
review granted Nov. 13, 2019, S257844.)

appellants' request that we exercise our discretion to consider this claim.

Appellants contend if their claims were forfeited, their trial counsel rendered ineffective assistance by not objecting. Ineffective assistance of counsel may be shown on direct appeal where counsel's performance falls below an objective standard of reasonableness. (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301.) To prevail on an ineffective assistance of counsel claim, an appellant must show a reasonable probability of a more favorable outcome if counsel had objected. Specifically, appellants bore the burden of establishing they would not be able to pay the imposed amount of the fines and fees over time. Their sole argument in this regard is that they qualified for court-appointed counsel at trial and on appeal. This is not sufficient.

A.    *The Trial Court Must Clarify Its Rationale for Imposing Consecutive Sentences*

The prosecutor requested that the sentences for oral copulation and rape be imposed consecutively because the offenses had occurred at separate times and places – the oral copulation in the vehicle first and then the rape inside the residence much later. The prosecutor believed the sodomy sentence should be imposed concurrently to the rape because they involved " 'mere' changes in position" and were part of the same transaction. The trial court decided to sentence all three convictions consecutively, explaining: "I know the D.A.'s office said that one of those counts should run concurrent because it arose out of the same course of conduct but I disagree. There were three separate acts and in sex crimes we look at literally things like what position was the victim in, was there a break in the sexual activity, did the defendant harbor separate intents,

and I find that was true in each of these situations.  The rape and the sodomy, the positions were changed.  She was moved from one location to another.  And I believe that the defendant harbored separate intents in each of those.  So I choose to run each of those fully consecutive, which then gets us to 105 years to life."

Johnson contends the trial court abused its discretion in imposing consecutive sentences on the rape and sodomy counts, because either 1) the trial court mistakenly believed that the acts occurred on separate occasions within the meaning of section 667.6, subdivision (d), and 667.61, subdivision (i), mandating consecutive sentences, or 2) the trial court based the exercise of its discretion on factual determinations that were not supported by the record.

Respondent contends Johnson forfeited this claim by failing to object in the trial court.  Johnson contends he is excused from forfeiture because an objection would have been futile or, in the alternative, his counsel was constitutionally ineffective for failing to object.  We agree that an objection would have been futile given the trial court's stated intention to impose the sentence over the prosecutor's recommendation.

It appears the trial court did not find that consecutive sentences were mandatory.  The court stated: "I choose to run each of those fully consecutive."  The court did not use the phrases "separate occasions" or "opportunity to reflect" which are the touchstones of mandatory consecutive sentencing.

Respondent contends the uncontradicted evidence that Johnson had an opportunity to reflect between the sodomy and the rape compelled consecutive sentences.  (See e.g. *People v. Lee* (1990) 219 Cal.App.3d 829, 836 [reviewing court will only find

entrapment as a matter of law if the evidence is " 'so compelling and uncontradicted the jury could draw no other reasonable inference' "].)

Section 667.61, subdivision (i) provides: "the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."

Section 667.6, subdivision (d) provides: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Here, Johnson's act of sodomy was interrupted by Stephine's crying and screaming and by Mancha's statement that the noise would disturb his children. Johnson hit Stephine. Then, when Johnson indicated his intention to switch to vaginal intercourse, Stephine asked Johnson to use a condom. Johnson hit Stephine again. Then he began the rape. These interactions were a brief break in Johnson's sexual activity. We do not find the evidence so compelling that a reasonable trier of fact could draw only an inference of reflection. (See *People v. Dearborne* (2019) 34 Cal.App.5th 250, 255 [no opportunity to reflect where defendant told victim to orally copulate him and she "told

57

defendant she did not want to" and "was crying and gagging as she orally copulated defendant.  Defendant ordered [the victim] to lay down on the backseat and he raped her."].)

Turning to the trial court's factual findings in support of its exercise of discretion, we find substantial evidence to support two of the factors identified by the court.  It is undisputed that Johnson changed the victim's position between the sodomy and the rape.  It is also undisputed there was a brief break in the form of Mancha objecting to the noise and Stephine asking Johnson to use a condom.  These are very weak reasons to impose a consecutive sentence of 25 years to life.

The trial court did not identify what separate intents Johnson might have harbored.  Generally, a defendant who commits multiple different sex crimes against a single victim has a single criminal objective:  to sexually assault the victim.  (See *People v. Hicks* (1993) 6 Cal.4th 784, 789 [defendant who entered bakery and forcibly raped, sodomized and digitally penetrated the victim had the single criminal objective of sexually assaulting the victim].)  Astonishingly, respondent claims that the "sadistic intent associated with the sodomy was markedly different from the intent to commit the intercourse as the former involved infliction of much foreseeable pain upon the victim."  There is no evidence that Johnson decided to sodomize Stephine because he enjoyed the thought that it would cause pain, while believing that vaginal rape would not.  Johnson was violent with Stephine throughout their time together.  Surely respondent does not believe that as a general rule victims of forcible vaginal intercourse do not experience physical pain and rapists who choose rape over sodomy are being gentler and more considerate?  At a minimum, respondent might wish to read *Hicks,* which

involves both sodomy and rape and finds the same criminal objective for both offenses.

The trial court also failed to identify the change in location which occurred in connection with Johnson's commission of the sodomy and rape. Respondent points out there was evidence that Mancha moved Stephine to another room to rape her and suggests that the trial court could have considered this movement because both men were convicted of rape in concert. Johnson was convicted of only one count of rape in concert. In the abstract, that conviction could have been either for Johnson's commission of the rape with Mancha's assistance, or for Johnson's assistance of Mancha's rape, but not both. Given that the jury found true the allegation that Johnson personally used a firearm in the commission of the rape and not true the allegation that Mancha personally used a firearm, it seems virtually certain that the jury based its conviction on Johnson's commission of rape with Mancha's assistance and not the reverse. Thus, Mancha's subsequent movement of the victim was not a proper consideration in sentencing Johnson.

An objection, however futile, might have prompted the trial court to clarify its reasoning, which in turn might have provided a more solid basis for the imposition of the consecutive term. Accordingly, we remand this matter to the trial court to clarify its reasons or to reconsider its imposition of consecutive sentences.

## DISPOSITION

The judgment of conviction is affirmed in its entirety as to appellant Mancha.  We order appellant Johnson's conviction for kidnapping reduced to the lesser included offense of felony false imprisonment.  We remand this matter as to appellant Johnson to permit the trial court to resentence him on the false imprisonment count and to clarify or reconsider its rationale for imposing consecutive sentences on him for the rape and sodomy convictions.  We affirm the judgment of conviction as to appellant Johnson in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J

60